In re 139–141 OWNERS CORP., Debtor

Nos. 04 Civ. 3641(CM),
04 Civ. 3642(CM).

United States District Court,
S.D. New York.

Aug. 13, 2004.

Mark Allen Frankel, Backenroth, Frankel & Krinsky, LLP, New York, NY, for Debtor.

Douglas S. Skalka, Neubert, Pepe & Monteith, New Haven, CT, for Appellee.

## DECISION AND ORDER

MCMAHON, District Judge.

### BACKGROUND

Appellant Debtor is the owner of two adjoining commercial properties known collectively as 139–141 Main Street, Mount Kisco, New York (the "Property"). The Property was subject to two mortgages, a $600,000 original principal amount first mortgage held by Appellee Development Strategies Company, LLC Profit Sharing Plan ("DSC"), as assignee of Fourth Federal Savings Bank, and $75,000 principal amount second mortgage held by Appellant Golden Age Mortgage Corp. ("GAMC"). DSC and GAMC are affiliated by common ownership.

In September 2002, the Debtor defaulted under both mortgages.

On October 28, 2002, GAMC sent the Debtor a notice of default on the mortgage (the "Notice of Default"), which the Debtor received on or about November 1, 2002.

On November 8, 2002, the Debtor tendered $3,500 in arrears due and owing, but GAMC returned the check with a note stating that the Debtor was in default, and stating that the total mortgage amount was due. GAMC sought payments totaling $100,050.

In a further effort to satisfy her obligations, the Debtor embarked on the sale of the half of the Property known as 141 Main Street ("141 Main Street"), and, by December 2002, had received an offer for $875,000.

On December 19, 2002, DSC acquired the first mortgage from Fourth Federal Savings Bank at face value. The mortgage note paid 24%. In order to effect the purchase, DSC borrowed money at 24%.

On December 20, 2002, DSC sent notice to the Debtor of its intent to accelerate the principal balance due under the mortgage note, with the entire principal balance, plus interest accruing at the default rate, then becoming payable. DSC sought payments totaling $742,492.37.

On December 30, 2002, the Debtor's attorney sent a letter to GAMC seeking a payoff letter and GAMC's forbearance from further action in light of the anticipated sale of a portion of the Property.

On January 3, 2003, the Debtor's attorney sent another letter to GAMC and DSC (collectively, the "Mortgagees"), wherein he requested on the Debtor's behalf that the Debtor be allowed to reinstate the notes and mortgages.

On January 14, 2003, the Mortgagees sent the Debtor a letter refusing to reinstate the notes and mortgages and reiterating their demand for payment in full.

On May 20, 2003, the Debtor filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code before Judge Hardin of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

On June 10, 2003 GAMC sent the Debtor a letter stating, "the following computation constitutes the amount due for satisfaction of this mortgage loan through July 15, 2003." The statement included a $1,500 charge for "Extension fee due." GAMC had also, on January 10, 2003, sent the Debtor a letter indicating that $3,000 in extension fees were due. The January 10 note, however, was not in the record reviewed by Judge Hardin, and is therefore outside the scope of this appeal.

On June 25, 2003, DSC filed an objection to the Debtor's proposed sale of 141 Main Street on the basis that the sale proceeds were insufficient to pay the secured liens on the Property. By Statement dated June 30, 2003, the Debtor challenged the amount of DSC's secured claim and alleged that it could reinstate DSC's mortgage under a plan pursuant to Section 1124 of the Bankruptcy Code.

On July 1, 2003, the Bankruptcy Court held an auction pursuant to 11 U.S.C. Section 363 in which it sold 141 Main Street free and clear of liens, with liens to attach to the proceeds of the sale, for the sum of $870,000. The sale closed pursuant to its terms. GAMC and DSC were each paid a portion of the claimed balanced due on the mortgages from the proceeds of the Section 363 sale. Debtor's counsel held that balance of the sale proceeds in escrow pending resolution of the dispute with respect to GAMC and DSC's claims for default interest and attorneys' fees.

The Debtor has been solvent at all times during this action. Prior to September 2002, the debtor's assets exceeded its liabilities by more than double, and after the sale of the building at 141 Main Street for $870,000 and payment of all its debts, the debtor is left with substantial cash, the building at 139 Main Street of presumably equal value, and no debt. The debtor's monthly rent roll for 139–141 Main Street was $18,800, and the debtor has never claimed that its rental income was insufficient to cover all expenses of the buildings and all obligations under the first and second mortgages.

On July 7 and 8, 2003, GAMC and DSC respectively filed motion papers in support of their secured claims, including default rate interest and attorneys' fees. The Debtor replied on July 9, 2003.

The Debtor filed its Disclosure Statement and Plan of Reorganization dated June 30, 2003 (the "Plan"), which Plan sought to pay unsecured creditors in full plus interest at the rate of 9%, but to pay the secured creditors (GAMC and DSC) only their claims at the non-default interest rate provided in each mortgage note. The Debtor proposed to retain the surplus from the proceeds of the sale to its own benefit. GAMC and DSC filed objections

to the Plan because each was entitled to default rate interest and attorneys' fees.

On July 29, 2003, the Bankruptcy Court held a hearing on the confirmation of Debtor's Plan of Reorganization (the "Confirmation Hearing"). The Court confirmed the Plan by order dated July 30, 2003.

On December 24, 2003, the Bankruptcy Court issued a decision granting DSC's claim for default rate interest, finding that "where the mortgaged property has been sold for an amount sufficient to pay all unsecured creditors in full with statutory interest [a]s a matter of law and on the facts in this case" an over-secured creditor may not be deprived of a contract right to a default rate of interest under 11 U.S.C. Section 1124(2) for the sole benefit of the debtor. *In re 139–141 Owners Corp.,* 306 B.R. 763, 765 (Bankr.S.D.N.Y.2004). The Bankruptcy Court also granted DSC's claim for attorneys' fees because they "were necessary in order to defend against an unwarranted bankruptcy filing and vindicate its contractual right to default rate interest." *Id.* at 777.

The Court, however, denied GAMC's claim for default rate interest, finding that it had not complied with the Notice of Default provisions of the mortgage note which acted as a trigger for default rate interest. The Court further found that GAMC was not entitled to attorneys' fees because the fees were incurred to collect a debt the Debtor intended to pay and/or to asset a claim for default rate interest to which GAMC was not entitled.

The Debtor has filed this appeal, claiming that the Bankruptcy Court erred in allowing DSC's claim for default interest and attorneys' fees under the Debtor's plan of reorganization.

GAMC has also appealed the Bankruptcy Court's decision denying its claims for default rate interest and attorneys' fees.

On August 13, 2004, I heard oral arguments on both appeals.

## DISCUSSION

### I. *Standard of Review*

■■■ As explained in *Troy Savings Bank v. Travelers Motor Inn, Inc.,* 215 B.R. 485, 488–89 (N.D.N.Y.1997):

The standard of review for bankruptcy appeals is set forth in Bankruptcy Rule 8013, which provides, inter alia, that findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013. A finding is only clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir.1992). Additionally, a bankruptcy court's legal conclusions are subject to a de novo review by the reviewing court. *See In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2d Cir.1992).

### II. *The Debtor's Arguments*

The Debtors puts forth two arguments on appeal: (1) that DSC's request for default interest be denied because 11 U.S.C. Section 1124(2) requires reinstatement of the Debtor's "original payment schedule," including the original interest payment schedule; and (2) DSC is not legally entitled to attorneys' fees for its "attempt to avoid reinstatement of a mortgage," and that, even if it is, the fees requested are not reasonable.

Neither argument compels me to overturn Judge Hardin's decision.

A. *The Award of Default Interest Is Upheld*

There is only one statutory basis for denying a mortgagee's contractual right to interest at a default rate—Section 506(b) of the Bankruptcy Code.

Section 506(b) provides for the allowance of interest on an over-secured claim. It states:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The Second Circuit, however, has held that the determination of whether to award pre-confirmation interest is solely within the discretion of the court. *Key Bank Nat'l Assoc. v. Milham,* 141 F.3d 420, 423 (2d Cir.1998).

■ Plaintiff's allegation that Section 1124(2) requires the court to award pre-conformation interest is simply misplaced. First, the plain language of Section 1124(2) says nothing about default interest rates. Section 1124(2) provides, in relevant part,

> a class of claims or interests is impaired under a plan unless ... the plan ... notwithstanding any contractual provision ... that entitles the holder of such claim or interest to demand or receive *accelerated payment* of such claim or interest after the occurrence of a default ... does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

As Judge Hardin correctly noted, "Subsection (2) on its face is concerned only with a contract provision requiring 'accelerated payment' upon a default, and the statute permits the debtor to de-accelerate and reinstate the pre-default maturity of the loan only if the plan (D) 'does not otherwise alter' the secured creditor's contractual rights." *In re 139–141 Owners Corp.,* 306 B.R. at 768. Because the denial of a mortgagee's contractual right to interest at a default rate does "alter" the secured creditor's contractual rights within the meaning of subsection (D) of Section 1124(2) ... Section 1124(2) ... does not provide a statutory basis for judicial nullification of a contract right to default rate interest." *Id.*

Second, controlling caselaw in this Circuit does not support Plaintiff's expansive reading of Section 1124(2). In *In re Taddeo,* 685 F.2d 24 (2d Cir.1982), the Second Circuit held that mortgagors and debtors under Chapter 13 of the Bankruptcy Code could cure a default and return to their original monthly payment schedule despite THE mortgagee's pre-bankruptcy acceleration of the mortgage. In so holding, the Court discussed Section 1124(2), noting that it "merely takes away the creditor's right to vote in the event of cure ... the event of default is remedied and the consequences are nullified." *Id.* at 29. *In re Taddeo* says nothing whatsoever about reinstatement of the pre-default interest rate. Thus, while a few Bankruptcy courts in this circuit and Appeals courts in other circuits have found that § 1124(2) does apply to post-default interest rates, *see e.g., In re Forest Hills Assocs.,* 40 B.R. 410, 415 (Bankr.S.D.N.Y.1984); *Platinum Capital Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),* 314 F.3d 1070, 1074–75 (9th Cir.2002), there is nothing in the plain language of § 1124(2) or in Second Circuit caselaw that supports that determination.

■ Finally, Judge Hardin did not abuse his discretion in finding that the

balance of the equities favored awarding DSC the contractual interest rate. The Debtor argues that the Bankruptcy Court, in reaching its decision, ignored the fact that DSC borrowed money at a 24% rate in order to purchase the Debtor's first mortgage at an 8.5% interest rate. According to the Debtor, this transaction, when coupled with DSC's subsequent refusal to accept reinstatement of the note and mortgage in January 2003, indicates that DSC purchased the first mortgage "for the purpose of putting the Debtor in default."

Even if I were to conclude that DSC did purchase the Debtor's first mortgage for the purpose of putting the Debtor in default, I cannot find that Judge Hardin's determination was clearly erroneous. Although the Bankruptcy Court was aware of the relationship between the DSC and GAMC, it was unwilling to sanction the solvent Debtor's intentional non-payment of its mortgage debt followed by its filing of a bankruptcy petition to avoid contractual default rate interest by rewarding it with the nullification of default rate interest to which DSC was contractually entitled. In so doing, it relied on *Ruskin v. Griffiths,* 269 F.2d 827 (2d Cir.1959), *cert. denied,* 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960), in which the Second Circuit found that it would be inequitable and inappropriate to deny a creditor's right to interest at the default rate, particularly where the debtor was solvent and knowingly bargained for the terms of his contract. *Ruskin* remains the law of the Second Circuit and applies to this case. *Citibank v. Nyland,* 878 F.2d 620 (2d Cir. 1989) ("[N]o decision of this Court or any New York court has impaired the vitality of *Ruskin.*"); *In re Vest Assocs.,* 217 B.R. 696, 702–03 (Bankr.S.D.N.Y.1998). Therefore, the Bankruptcy Court's award of default rate interest to GSC must be allowed to stand.

**B.** *The Award of Attorneys' Fees is Upheld*

■ Judge Hardin's decision whether to award attorneys' fees is subject to review for abuse of discretion. *See Wells v. Bowen,* 855 F.2d 37, 46 (2d Cir.1988); *see also Sciarrino v. Mendoza,* 201 B.R. 541, 543 (E.D.Cal.1996) ("The abuse of discretion standard applies to the bankruptcy court's decision to impose sanctions for violating 524 and in the determination of reasonable attorneys fees.").

■ Bankruptcy Code Section 506(b) provides that, to the extent that the value of the collateral securing a claim is sufficient, a creditor is to be allowed "any reasonable fees, costs, or charges provided under the agreement under which such claim arose." *See also Cordius Trust v. Kummerfeld,* 2000 WL 264316 at *1, 2000 U.S. Dist. LEXIS 2580 at *2 (S.D.N.Y 2000) ("reasonable attorneys' fees are properly awarded when authorized by agreement"). The Debtor does not dispute that the DSC is entitled to attorneys fees under the terms of the DSC note. Rather, the Debtor argues that DSC is not entitled to compensation for legal fees incurred in attempting to avoid reinstatement of a mortgage under Section 1124. The Bankruptcy Court, however, found that "The problem with this argument is that debtor's bankruptcy filing was not for the purpose of 'reinstatement of a mortgage' ... [but] to sell the property, pay off the mortgage debt and, most particularly, nullify the debtor's contractual and state law obligation to pay default rate interest." *In re 139–141 Owners Corp.,* 306 B.R. at 777. As the Debtor has in fact conceded this purpose, I conclude that Judge Hardin's finding was not clearly erroneous. In addition, Judge Hardin's decision to limit the fees to those "necessary in order to

defend against an unwarranted bankruptcy filing and vindicate its contractual right to default rate interest" was appropriate. *Id.*

### III. *GAMC's Arguments*

#### A. *The Denial of Default Interest and Attorneys' Fees Is Vacated*

The Bankruptcy Court found that GAMC was not entitled to default rate interest because GAMC failed to properly notify the Debtor with the required notice and opportunity to cure under the mortgage note. GAMC does not dispute the Bankruptcy Court's reasoning in denying default interest based on improper notice under the mortgage. Rather, for the first time on appeal, GAMC makes an argument, not raised below, that it is entitled to default interest because its mortgage note matured by its terms. *Regency Savings Bank, F.S.B. v. Merritt Park Lands Associates*, 139 F.Supp.2d 462, 469 (S.D.N.Y.2001) ("Furthermore, when on January 1, 2001, the Mortgage matured, the entire balance became due. None of the procedural defects alleged therefore stand as a bar to foreclosure.").

 "In general, appellate courts do not consider issues that were not raised before the trial court." *Sunbeam Products, Inc. v. Wing Shing Products*, 311 B.R. 378 (S.D.N.Y.2004) (citing *Baker v. Dorfman*, 239 F.3d 415 (2d Cir.2000)). That admonition is particularly relevant here where, at oral argument, the Debtor's counsel attempted to present evidence allegedly contradicting GAMC's argument that was not only not in the record before Judge Hardin, but had not previously been submitted to this Court. Until the record is fully developed, it makes no sense for me to review GAMC's argument.

Accordingly, I vacate the Bankruptcy Court's decision denying GAMC its right to default rate interest, and remand the matter to Judge Hardin to allow him to develop the record on that issue.

I also vacate and remand the Bankruptcy Court's decision to deny GAMC's application for attorneys fees because it was based, at least partially, on the decision to deny GAMC default rate interest.

### CONCLUSION

For the reasons set forth above, the Bankruptcy Court's memorandum decision to grant DSC default rate interest and attorneys' fees is affirmed. Its decision to deny GAMC default rate interest and attorneys' fees is vacated and remanded.

So ordered.